

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00431-CV

———————————————

CITY OF HIGHLAND VILLAGE, TEXAS, Appellant

V.

TYLER DEINES AND DOROTHY PALUMBO, Appellees

On Appeal from the 481st District Court
Denton County, Texas
Trial Court No. 24-1506-481

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

This case arises from flood damage to the home of Appellees Tyler Deines and Dorothy Palumbo (the Homeowners). During the month prior to the flood, Appellant City of Highland Village, Texas, had used skid-steer-type vehicles to place rocks near the Homeowners' property. On the day of the flood, the City delivered skid-steer-type equipment to the area adjacent to the Homeowners' home so that the City could begin its Sewer Line Stabilization Project. That evening, over three inches of rain fell, and the Homeowners' home flooded.

The Homeowners sued the City, alleging a claim under the Texas Tort Claims Act and, in the alternative, a claim for inverse condemnation.[1] The City answered, asserting a general denial and the affirmative defense of governmental immunity, and later filed a plea to the jurisdiction, arguing (1) that its immunity was not waived because it did not use motor-driven equipment and (2) that the Homeowners had failed to properly plead an inverse-condemnation claim. After additional filings by the parties and a hearing, the trial court denied the plea.

In two issues, the City complains that the trial court erred by denying its plea to the jurisdiction because the alleged damage was not caused by the use of motor-driven equipment and because the Homeowners had failed to properly plead an inverse-

---

[1]The Homeowners also asserted a claim for violations of the Texas Water Code, but they later abandoned that claim.

condemnation claim. Because we agree with the City's arguments, we reverse the trial court's denial of the City's plea to the jurisdiction, and we remand this case to the trial court to provide the Homeowners with an opportunity to replead.

## II. Factual and Procedural Background

The Homeowners alleged that they had been living on Remington Drive West in Highland Village for approximately four years when they filed their petition. The home sits on the bank of Lake Lewisville and is in a neighborhood that contains primarily single-family residences.

The Homeowners further alleged that for several years prior to the flooding incident at issue, Remington Drive had experienced drainage issues. In March 2021, the Homeowners reported the drainage issues to the City Council and to the city manager, and the City commissioned a study. The study recommended three remedial measures: reshaping the swale next to the Homeowners' home, changing the grate in the aesthetic water feature across the street to allow more water to flow from the pond into the underlying storm drain, and installing a curb cut to allow the water to better reach the swale.[2]

According to the Homeowners, in March 2022, the City filled a swale entryway on or adjacent to their property with large rocks using two skid-steer-type motor vehicles. Per the City, this work was separate from the remedial measures

---

[2]The record is unclear regarding whether any of the remedial measures were implemented.

3

recommended by the study, was done "in order to install riprap on the sew[e]r line," and was undertaken "in order to recover a sanitary sew[e]r line that [had] bec[o]me exposed due to erosion from the lake (the 'Sew[e]r Line Stabilization Project')." As part of that project, on April 4, 2022, the City delivered equipment to the site, and "protection was put over the water inlet on the west side of Remington [Drive] as required by the City's MS4 permit and the EPA." According to the Homeowners' petition, the City's activity "left the storm drains blocked by sediment rocks,[3] which left the swale blocked with large rocks." The Homeowners further alleged that "bobcats [the skid-steer-type motor vehicles] were parked in the swale with large blades facing the street." According to the Homeowners, the rain that fell that evening was diverted onto their property and into their home as a result of the City's negligent conduct and its use of motor-driven vehicles.

The Homeowners informed Councilman Daniel Jaworski of the flood event, and he toured the damaged area. The Homeowners also gave the City, via its city manager, notice of their claim for damages. In response to the Homeowners' claim against the City, the Texas Municipal League Intergovernmental Risk Pool[4] notified

---

[3]Other places in the record, the term "sediment socks" is used. Based on the photo in the record, the term appears to refer to a long slender bundle of hay that was used to block off the storm drain.

[4]According to its website, the Texas Municipal League Intergovernmental Risk Pool "offer[s] and provide[s] Texas municipalities and other units of local government with a stable and economic source of risk financing and loss prevention services." *See* https://tmlirp.org/who-we-are (last visited Feb. 4, 2025).

the Homeowners that based on the facts revealed in its investigation, it had concluded that the alleged damages were not caused by any wrongful act, omission, or negligence on the City's part and denied the Homeowners' claim.

The Homeowners then sued the City. As explained above, the City filed a plea to the jurisdiction, which the trial court denied. This interlocutory appeal followed.

### III. The Law on Sovereign Immunity and Pleas to the Jurisdiction, as well as the Standard of Review

Unless the State consents to suit, sovereign immunity deprives a trial court of subject-matter jurisdiction over lawsuits against the state or certain governmental units. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004) (op. on reh'g). Cities are political subdivisions of the state and, absent waiver, are similarly entitled to governmental immunity. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006) (op. on reh'g).

We have previously explained the nature of a plea to the jurisdiction and set forth the standard of review that we apply when reviewing a plea to the jurisdiction:

> A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject[-]matter jurisdiction. *Harris [County] v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). A plea to the jurisdiction may be utilized to challenge whether a plaintiff has alleged facts that affirmatively demonstrate the trial court's jurisdiction to hear the case or to challenge the existence of jurisdictional facts. *Mission Consol. [ISD] v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012). Whether a trial court has subject[-]matter jurisdiction, whether a plaintiff has alleged facts that affirmatively demonstrate a trial court's subject[-]matter jurisdiction, and whether undisputed evidence of jurisdictional facts establishes a trial court's subject[-]matter jurisdiction are questions of law that we review de novo. *City of Westworth Vill[age] v. City of White Settlement*, 558 S.W.3d 232, 239

5

(Tex. App.—Fort Worth 2018, pet. denied) (citing . . . *Miranda*, 133 S.W.3d [at] 226 . . . ).

When a plea to the jurisdiction challenges the pleadings[,] . . . we determine if the plaintiff has alleged facts that affirmatively demonstrate the trial court's jurisdiction to hear the case. *Tex. Dep't of Crim. Just. v. Rangel*, 595 S.W.3d 198, 205 (Tex. 2020) (citing *Miranda*, 133 S.W.3d at 226). In making that determination, we liberally construe the pleadings in the plaintiff's favor, taking all factual assertions as true, and looking to the plaintiff's intent. *Id.* (citing *City of Ingleside v. City of Corpus Christi*, 469 S.W.3d 589, 590 (Tex. 2015)). Even under that liberal construction, the plaintiff bears the burden of demonstrating, through the facts alleged in his live pleading, that immunity from suit has been waived. *Doe v. City of Fort Worth*, 646 S.W.3d 889, 897 (Tex. App.—Fort Worth 2022, no pet.). If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but also do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded the opportunity to amend. *Miranda*, 133 S.W.3d at 226–27; *City of Westworth Vill*[*age*], 558 S.W.3d at 239. If, however, the pleadings are incurably defective—in other words, the allegations affirmatively negate the trial court's jurisdiction—then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Tex. A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 840 (Tex. 2007); *Miranda*, 133 S.W.3d at 227.

To the extent a plea to the jurisdiction challenges the very existence of jurisdictional facts, we look beyond the pleadings and consider evidence submitted by the parties "when necessary to resolve the jurisdictional issues raised," even if the evidence implicates both the court's jurisdiction and the merits of a claim. *Rangel*, 595 S.W.3d at 205 (quoting *Miranda*, 133 S.W.3d at 227). "For a plea that challenges the existence of jurisdictional facts, our standard of review generally mirrors that of a traditional summary judgment: a plaintiff must raise a genuine issue of material fact to overcome the challenge to the trial court's jurisdiction." *Id.*; *Miranda*, 133 S.W.3d at 221, 228.

We address the question of whether the trial court has jurisdiction on a claim-by-claim basis. *Tex. Woman's Univ. v. Rodriguez*, No. 02-22-00278-CV, 2022 WL 17687433, at *8 (Tex. App.—Fort Worth Dec. 15, 2022, no pet.) (mem. op.).

6

*Kamy Invs., LLC v. Denton Cnty. Appraisal Rev. Bd.*, No. 02-23-00487-CV, 2024 WL 3611451, at \*7–8 (Tex. App.—Fort Worth Aug. 1, 2024, no pet.) (mem. op.) (quoting *Leonard v. City of Burkburnett*, No. 02-22-00266-CV, 2023 WL 8940816, at \*7–8 (Tex. App.—Fort Worth Dec. 28, 2023, no pet.) (mem. op. on reh'g)).

### IV.  The Homeowners' Claims Under the Tort Claims Act

In its first issue, the City argues that there is no waiver of its immunity because there was no use of motor-driven equipment.  Specifically, the City argues that there is no evidence that it put any motorized equipment into use immediately preceding or during the rainstorm.  As we explain below, the Homeowners' current pleading of their claims under the Tort Claims Act fails to meet the Act's causation requirement to waive the City's immunity.

Regarding sovereign immunity and the Tort Claims Act, the Act has a limited waiver of immunity for certain tort claims.  *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 101.001–.109.  Section 101.021(1)(A) of the Act provides that a governmental unit in the state is liable for

> (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:
>
>> (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment[.]

*Id.* § 101.021(1)(A).  "A plaintiff must begin . . . by alleging circumstances that fit within a provision of the Act that authorizes a waiver."  *Rattray v. City of Brownsville*,

7

662 S.W.3d 860, 866 (Tex. 2023). We conclude that the Homeowners did that by asserting that the flooding of their home followed from circumstances described in Section 101.021(1)(A). *See id.*

We next look at the "use" challenge made by the City. The Texas Supreme Court has defined "use" as "to put or bring into action or service; to employ for or apply to a given purpose," but the supreme court has admitted that such definition is "'not particularly enlightening.'" *Id.* at 871. The supreme court has further noted that the statute "does not explicitly require that the operation or use be 'active' or that it be ongoing 'at the time of the incident.'" *Id.* at 872.

In its plea to the jurisdiction, the City did not dispute that a skid steer has a motor but argued instead that "the phrase 'operation or use' does not apply whe[n] the motor[-]driven equipment is not actually operating or put into use at the time of the alleged injury." The City's argument, intimating that the skid steers must have been in use during the rainstorm in order to meet the statutory definition, goes too far. When the Texas Supreme Court looked at a somewhat similar issue in *Rattray*, it concluded that the homeowners' pleading regarding use sufficed:

> The North Laredo Gate has a motor; city employees closed the gate during a rainstorm; and the flooding of the homeowners' properties happened soon after—within about an hour of—the closure. We think this is enough to conclude that the North Laredo Gate was put to "operation or use" as we have come to understand that phrase in [Section] 101.021(1)(A). Closing the gate put it to its intended purpose: blocking water. . . .
>
>    . . . .

8

Under this record, therefore, we see no meaningful way to separate the alleged "nonuse" (the failure to close the gate) from the immediately preceding "use" (the opening of the gate). In short, we conclude that, at least at this stage, the homeowners' allegations concern the "operation or use" of "motor-driven equipment" under [Section] 101.021(1)(A) of the Texas Tort Claims Act.

*Id.* at 872–73. We similarly conclude that the Homeowners' allegations—that the City used bobcats in working on the sewer line near their property—concern "operation or use" of "motor-driven equipment" under Section 101.021(1)(A) of the Act.

Our inquiry into the applicability of Section 101.021(1)(A) does not end there because the City challenges the Homeowners' tort claims under the statute's nexus requirement, which requires us to determine if the property damages "ar[o]se[] from" the operation or use of the bobcats. *See id.* at 873. The Homeowners can satisfy the "arising from" standard by demonstrating proximate cause, i.e., that the governmental employee's use or operation of the vehicle or equipment proximately caused the relevant injury. *See id.* at 873–74. In making this causal assessment, particularly in the Tort Claims Act context, we look to the record and the pleadings to determine if the alleged cause is too geographically or temporally attenuated from the alleged effect. *Id.* at 874. In essence, we look to see if the Homeowners' pleadings show that the City's use of the skid steers as part of the Sewer Line Stabilization Project on the swale adjacent to the Homeowners' property during the day on April 4, 2022, caused

the Homeowners' house to flood when it rained that night.[5] We hold that at this stage of the pleadings, the Homeowners' allegations are not sufficient to meet the causation requirement.

At this stage, the Homeowners have made a bare allegation of negligence. Their petition does not differentiate between the City's remedial work following the report of flooding in March 2021, the work undertaken in March 2022, or the City's April 4, 2022 work; the information about the latter was provided by the City in its plea to the jurisdiction. The Homeowners' petition instead complains generally of the City's work near their property without providing a temporal connection to show what action(s) proximately caused the damage to their home:

> 4.03 In March of 2021, the [Homeowners] reported flooding to the City Council and [the] city manager, and the City undertook to investigate the cause. A report was generated on March 12, 2021, recommending additional work be done to prevent future flooding.

---

[5]The Homeowners contend that the City left the bobcats parked in the swale with the blades facing the street; the City initially contended in its plea that "[t]he equipment was parked and turned off" but later argued in its reply that there was no evidence that any City motor-driven equipment "was in use or even parked on the swale adjacent to their property." The City carries this latter argument into its initial brief and its reply brief on appeal. Because we must liberally construe the Homeowners' pleadings, see *Rangel*, 595 S.W.3d at 205, we presume for purposes of our analysis that the bobcats were parked on the swale during the rainstorm. At this point, this case is therefore distinguishable from the case that the City relies on in which motor-driven equipment was used to repair a sewer line and in the process caused dirt and debris to be piled into a "dirt dam," the equipment was removed from the property, and the property later flooded during an "exceptionally rainy" week. *See Green v. City of DeSoto*, No. 05-23-00740-CV, 2024 WL 3337795, at *1 (Tex. App.— Dallas July 9, 2024, no pet.) (mem. op.).

10

4.04 In March of 2022, the City filled a swale entryway on or adjacent to [the Homeowners'] property with large rocks using two skid-steer-type motor vehicles in two large bobcats to install riprap on the sewer line at lake shoreline.[6] They hauled the rock across the [Homeowners'] property near the lake, tearing up the lawn without any notice or permission.

4.05 This activity left the storm drains blocked by sediment rocks, which left the swale blocked with large rocks[,] and the bobcats were parked in the swale with large blades facing the street. There was a rain event the evening of April 4, 2022[,] where substantial amounts of water were diverted onto the [Homeowners'] property and into their home[] as a result of the acts and negligence of the City.

4.06 Shortly thereafter, [the Homeowners] informed Councilman Daniel Jaworski of the flood event[,] and he toured the damaged area. Despite claims to the contrary, this was not a highly unusual rain event. It was a malfunction of the City's drainage system due to the City's inaction and negligent action.

4.07 The [Homeowners] experienced serious damage to their home as a result of the City's negligent conduct and use of motor[-] drive[n] vehicle[s].

. . . .

5.02 The City's negligent use of a motor-driven vehicle or motor-driven equipment caused the rapid diversion of water onto the Property and into the home of the [Homeowners].

A bare allegation of negligent conduct "will not suffice to support [a] waiver of immunity," nor may the Homeowners overcome the Act's limited waiver of immunity with a general assertion of negligence. *See City of McAllen v. Diaz*, No. 13-23-00060-CV, 2024 WL 973122, at *5 (Tex. App.—Corpus Christi–Edinburg Mar. 7, 2024, no

---

[6]The record indicates that this work was related to an aesthetic water feature. There is no suggestion in the Homeowners' pleading that the water feature caused the flooding on April 4, 2022.

pet.) (mem. op.). Moreover, although the City concedes that "[it] may have furnished the condition that led to the flooding" of the Homeowners' home, case law makes clear that simply furnishing the condition is insufficient to waive the City's immunity under the Texas Tort Claims Act. *See Green*, 2024 WL 3337795, at *4 (holding that the homeowners had not demonstrated a waiver of governmental immunity because the City's use of motorized equipment did no more than furnish the condition that led to the homeowners' damages).

The Homeowners' current allegations are not sufficient to meet Section 101.021(1)(A)'s causation requirement to waive the City's immunity. *See id.* (holding that appellee did not allege any facts regarding the City's conduct that, if taken as true, would satisfy the cause-in-fact requirement of proximate cause). Accordingly, we sustain the City's first issue.

## V. The Inverse-Condemnation Claim

In its second issue, the City argues that the trial court improperly denied its plea to the jurisdiction because the Homeowners failed to properly plead an inverse-condemnation claim. Specifically, the City contends that the Homeowners failed to plead sufficient facts to show that the City intended to take their property. As with their claim under the Tort Claims Act, the Homeowners' current pleading of their inverse-condemnation claim falls short of pleading a claim for which the City's immunity is waived.

12

## A.    Applicable Law

The nature and requirements of a claim for inverse condemnation have recently been reiterated by the Texas Supreme Court:

> "The protection of one's right to own property is said to be one of the most important purposes of government. That right has been described as fundamental, natural, inherent, inalienable, not derived from the legislature and as preexisting even constitutions." *Eggemeyer v. Eggemeyer,* 554 S.W.2d 137, 140 (Tex. 1977). The Texas [c]onstitution helps ensure that government fulfills this purpose by providing a robust right to adequate compensation—and waiver of immunity—if a person's property is "taken, damaged, or destroyed for or applied to public use . . . unless by the consent of such person." Tex. Const. art. I, § 17(a); *see Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980). Our Takings Clause protects against more types of government action than its federal counterpart, as it contains the additional verbs "damaged," "destroyed," and "applied"—each of which creates a claim with its own distinct scope. *See City of Dallas v. Jennings*, 142 S.W.3d 310, 313 n.2 (Tex. 2004); *Steele*, 603 S.W.2d at 789–[]91.
>
> "When the government takes private property without first paying for it, the owner may recover damages for inverse condemnation." *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554 (Tex. 2004). The elements of an inverse condemnation or "takings" claim are that (1) an entity with eminent domain power intentionally performed certain acts (2) that resulted in taking, damaging, or destroying the property for, or applying it to, (3) public use. *See, e.g., Sw. Bell Tel., L.P. v. Harris* [*Cnty.*] *Toll Rd. Auth.*, 282 S.W.3d 59, 62 (Tex. 2009); *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001).
>
> Although the [c]onstitution does not expressly require an intentional act, we have explained that such a requirement helps ensure that the taking is for "public use." *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 820–21 (Tex. 2009). An intentional act satisfying the first element requires evidence that the entity either (a) "intended to damage the property" or (b) "kn[ew] that [its conduct was] causing identifiable harm" or that "specific property damage [was] substantially certain to result from [the conduct]." *Jennings*, 142 S.W.3d at 313–14. . . .

13

. . . .

. . . "[M]ere negligence [that] eventually contributes to the destruction of property is not a taking"; it is a negligence claim on which the government is immune from suit absent a waiver. *City of Tyler v. Likes*, 962 S.W.2d 489, 504–05 (Tex. 1997). . . .

. . . .

. . . This Court [has] identified . . . cases in which the government's intentional conduct is not itself a physical taking, damaging, or destruction of property but the conduct initiates a chain of events that "eventually contributes to" such harm. [*Jennings*,] 142 S.W.3d at 313. In that context, the property owner must show that the government (1) engaged in an affirmative act or course of conduct that resulted in the physical taking, damaging, destruction, or application of property; and (2) did so with the necessary intent under the second *Jennings* standard—that is, with knowledge that either the conduct was causing identifiable harm or specific property damage was substantially certain to result. *Id.* at 314; *see also Harris* [*Cnty.*] *Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799–800 (Tex. 2016)[ (op. on reh'g)].

These requirements ensure that when there is a causal chain linking the intentional government conduct to the eventual property damage, that damage occurred for "public use" because the government was aware [that] harm was substantially certain "and yet determine[d] that the benefit to the public outweigh[ed]" it. *Jennings*, 142 S.W.3d at 314; *see also Kerr*, 499 S.W.3d at 806–07. The *Jennings* standards also help to draw the line between takings claims and negligence claims against the government—which, as discussed above, are generally barred by immunity unless a waiver applies. *See Gragg*, 151 S.W.3d at 554.

*Tex. Dep't of Transp. v. Self*, 690 S.W.3d 12, 25–26, 28–29 (Tex. 2024) (footnotes omitted).

## B.    The Pleadings

We set forth the Homeowners' inverse-condemnation claim exactly as it is set forth in their petition:

14

6.01 The Texas [c]onstitution provides that "[n]o person's property shall be taken . . . for . . . public use without adequate compensation being made, unless by the consent of such person . . . ." Tex. Const. art. I, § 17. The [c]ourt has jurisdiction over this claim because the [City] intentionally performed certain acts that resulted in a taking, damaging, or destroying of the [Homeowners'] property for public use without the [Homeowners'] consent.

6.02 The City's conduct has diverted water in such a manner as to cause the [p]roperty to experience flooding every time there is a regular, significant rain event. Without their consent, the [Homeowners] were forced to take on, for public benefit, a deluge of storm water from the drainage construction.

## C.    Analysis

Here, there is no doubt that the City intended to work on the sewer line as part of its Sewer Line Stabilization Project. But as explained in the City's brief, "[t]he crux of [the Homeowners'] takings claim is that on April 4, 2022, the City either knew or should have known that doing work within its easement was substantially certain to cause flooding to [their] home." The City contends that "there is no evidence [that it] knew that when it moved rocks or dirt along the swale in order to access its drainage easement, flooding would occur." We agree with the City that the Homeowners' pleading is insufficient to show that the City knew that flooding was "substantially certain to result" from its conduct in moving the rocks. But the Homeowners' pleadings are not limited to the City's actions in moving the rocks.

As noted above in the discussion of the Homeowners' claims under the Tort Claims Act, they pleaded that the City had "left the storm drains blocked by sediment rocks" and had parked "the bobcats . . . in the swale with large blades facing the

15

street." It appears that these actions—blocking the drains and leaving bobcats in the swale—are the "certain acts" on which the Homeowners rely in pleading their inverse-condemnation claim.[7] The Homeowners, however, failed to take the next step of pleading that the City knew that such actions would result in flooding their home if it rained. *But see Prestonwood Estates W. Homeowners Ass'n v. City of Arlington*, No. 02-21-00362-CV, 2022 WL 3097374, at *7 (Tex. App.—Fort Worth Aug. 4, 2022, no pet.) (mem. op.) (holding that the homeowners had pleaded sufficient facts—including pleading that an engineer with the city's Stormwater Management Department had confirmed that the city was aware that the upstream properties would be damaged—to allege that when the city intentionally breached the dam, it knew that the damage to the homeowners' property was substantially certain to result from that act). The Homeowners admit as much in their brief:

> In their plea, the City specifically argues that the act of blocking the drainage was [(]1) intentional[] and [(]2) for the public benefit of performing the work on the sewer. Whether it was ultimately substantially certain that blocking off all the drainage in a heavy-flow area[] would cause water backup to the properties upstream is (while obvious to the average person) ultimately a question of fact for the jury. [Citation omitted.]

Similarly, although the parties discuss whether it is necessary to produce evidence to meet the flooding-recurrence requirement found in *Gragg*, recurrence goes to the merits of the Homeowners' inverse-condemnation claim and is not a pleading

---

[7]The Homeowners also emphasized at the plea hearing the City's action of "block[ing] all the drainage in front of someone's house."

16

requirement to invoke the trial court's jurisdiction. *See* 151 S.W.3d at 555 (deciding issue after a jury trial); *City of Lake Jackson v. Adaway*, No. 01-22-00033-CV, 2023 WL 3588383, at *5 (Tex. App.—Houston [1st Dist.] May 23, 2023, no pet.) (mem. op.) (collecting cases). Thus, at this stage, we need not consider whether the flooding event at issue rose to the level of "a taking."[8] *See Adaway*, 2023 WL 3588383, at *5.

Here, even construing the pleadings liberally in the Homeowners' favor, we cannot conclude that they have pleaded sufficient facts to allege that the City had "knowledge that either the conduct was causing identifiable harm or [that] specific property damage was substantially certain to result." *Self*, 690 S.W.3d at 28. We therefore sustain the City's second issue.

## VI.  Opportunity to Amend Petition to Replead

As the supreme court noted in *Miranda*, if the pleadings lack sufficient facts to affirmatively demonstrate jurisdiction but do not affirmatively demonstrate incurable jurisdictional defects, then the issue is one of pleading sufficiency, and the plaintiff should be afforded the opportunity to amend. 133 S.W.3d at 226–27; *Prestonwood*

---

[8]The Homeowners' brief states that they "are not alleging that their property was 'taken' within the meaning of Article I, Section 17 of the Texas Constitution" and that instead they are "alleg[ing] that their property was 'damaged' or 'destroyed.'" The Homeowners, however, specifically pleaded that "[t]he [c]ourt has jurisdiction over this claim because the [City] intentionally performed certain acts that resulted in a *taking*, damaging, or destroying of the [Homeowners'] property." [Emphasis added.] It was only Homeowner Deines's affidavit that omitted the word "taking" and that made the statement, "We experienced serious *damage* to our home as a result of the City's conduct . . . ." [Emphasis added.] If the Homeowners wish to limit their inverse-condemnation claim solely to how the flooding caused damage to their home, they will have the opportunity to do so when they are allowed to replead.

*Estates W. Homeowners Ass'n*, 2022 WL 3097374, at \*8. Here, the Homeowners' pleadings, while defective, do not demonstrate incurable defects in jurisdiction. The issue here is one of pleading insufficiency, not jurisdictional impossibility. *Prestonwood Estates W. Homeowners Ass'n*, 2022 WL 3097374, at \*8. Accordingly, consistent with *Miranda*'s instruction, we must remand this case to the trial court to allow the Homeowners the opportunity to amend their pleadings. *See* 133 S.W.3d at 226–27; *Prestonwood Estates W. Homeowners Ass'n*, 2022 WL 3097374, at \*8.

## VII.  Conclusion

Having sustained the City's two issues, we reverse the trial court's order denying the City's plea to the jurisdiction, and we remand this case to the trial court with instructions to allow the Homeowners the opportunity to replead and for further proceedings consistent with this opinion. *See* Tex. R. App. P. 43.2(d).

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  February 13, 2025

18