SEMINOLE INDIANS OF the STATE OF FLORIDA and the Seminole Nation of Oklahoma

v.

The UNITED STATES.

No. 1–71.

United States Court of Claims.

Feb. 18, 1972.

Nichols, J., filed concurring opinion.

Paul M. Niebell, Washington, D. C., for the Seminole Indians.

Charles Bragman, Washington, D. C., attorney of record for The Seminole Indians of the State of Florida; Effie Knowles and Roy L. Struble, Miami Beach, Fla., of counsel.

Paul M. Niebell, Washington, D. C., attorney of record for The Seminole Nation of Oklahoma.

Craig A. Decker, Washington, D. C., with whom was Asst. Atty. Gen., Kent Frizzell, for the United States.

Before COWEN, Chief Judge, LARA-MORE and DURFEE, Senior Judges, and DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

On Cross-Appeals from the Indian Claims Commission

PER CURIAM:

After our decision in United States v. Seminole Indians, 180 Ct.Cl. 375 (1967), upholding the Indians' aboriginal title to large parts of Florida, the Indian Claims Commission made a further determina-

tion as to the extent of the area properly claimed by the Seminoles (19 Ind.Cl. Comm. 179 (1968)), and, later, a determination that they were entitled to recover $12,347,500, less allowable offsets (23 Ind.Cl.Comm. 108 (1970)). One offset of $84,719.37 was thereafter allowed (24 Ind.Cl.Comm. 1 (1970)); and a final award was entered for $12,-262,780.63. The Seminoles have appealed, primarily directing their challenge to the amount of the award, but also raising certain other points.[1] The United States cross-appeals on one newly-raised issue relating to the extent of the area to be valued.

After hearing oral argument and considering the extensive briefs and the record, we are constrained to take the same course, on the Indians' appeal, as in United States v. Nez Perce Tribe, 194 Ct.Cl. 490, 502–503 (1971), cert. denied, 404 U.S. 872, 92 S.Ct. 75, 30 L.Ed.2d 116, and Sac and Fox Tribe of Indians of Oklahoma v. United States, 196 Ct.Cl. —— (Nov. 12, 1971)—a remand to the Commission to supply more specific findings and reasoning as to the valuation of the tracts involved in this case, i. e. Docket Nos. 73 and 151. See, also, Snake or Piute Indians, etc. v. United States, 112 F.Supp. 543, 125 Ct.Cl. 241 (1953). Our reasons are similar to those we gave recently in *Nez Perce Tribe* and *Sac and Fox Tribe*. The Commission's opinion and findings on valuation (23 Ind.Cl.Comm. 108) are so summary, conclusory, unexplained, sparse, and unspecific that the court is unable to say whether the ultimate conclusions on valuation are adequately supported by substantial evidence and untainted by legal error. The Seminoles' expert on valuation suggested a total figure of $47,960,000 for all the lands involved; the Government's expert gave the figure of $5,500,000. The Commission's total for the same tracts was

---

1. The prior interlocutory appeal was by the Government alone, and under the Indian Claims Commission Act the Indians, who did not appeal at that stage, are not barred from raising issues relating to the Commission's determination of liability. 25 U.S.C. § 70s(b) (as amended).

$14,550,000.[2] The spread between the parties's figures is obviously very great, but except for rejecting the extremes of the spectrum the Commission does not say why or in what part it rejected the general analysis of either party's expert or why it settled on the figure it did or what general weight it gave to various components of value. The opinion, after summarizing very generally some of the types of factors significant for valuation, one way and the other, simply says that it found the parties' expert witnesses helpful but cannot agree entirely with either party's position. The final sum is then given without further explanation. The findings are more detailed but not much more enlightening as to the reasons for the Commission's ultimate valuation. Insofar as the findings do more than to summarize the evidence, they are so broad that the court is unable to tell, within any acceptable limits, how the Commission regarded various factors important for valuation, or what significance it gave to the different factors. For instance, as to timber the Commission simply concludes, after listing a number of facts pro and con: "A prospective buyer of the Florida cession lands in 1823 or of the reservation in 1832 would have regarded the extensive pine stands as a favorable factor and would have regarded the remaining timber as a moderate plus factor." There is nothing to make this conclusion any more definite, or to show how it applies to the valuation ultimately adopted. With an opinion and findings of so summary and general a character, the court is unable to perform its review function, hardly more than if the Commission had given us solely its ultimate figures on valuation.

We are not holding or intimating that the Commission should, when it consid-ers valuation, adopt and follow some mathematical or other definite formula, or give exact or precise indications of the weight it gives to each and every factor, or spell out in detail every subsidiary consideration it took into account, or tie its conclusions to specific items of evidence. It would be enough if, as in United States v. Northern Paiute Nation, 393 F.2d 786, 800, 183 Ct.Cl. 321, 346 (1968), the Commission gave us "a good deal of enlightening discussion of the value issues [which] one cannot read * * * as a whole without getting a pretty clear idea of how they approached their task." That cannot be said of the present case; we have no such idea. In Sac and Fox Tribe of Indians v. United States, *supra*, 196 Ct.Cl. —— (Nov. 12, 1971), some of us felt that the Commission had adequately disclosed its reasoning, but here we are all agreed that the court has much too little on which to proceed.

Although both parties have argued the facts and the evidence to us as if we were the fact-finders, we emphasize that we have not considered the evidence and, on remanding to the Commission, we do not intimate any view whatever on the merits of the valuation issue. That is initially for the Commission as the fact-finder under the Indian Claims Commission Act, and since we have been unable to exercise our review function on the basis of the opinion and findings now before us, we have no position at all as to the merits. On remand, the Commission may supply the more specific findings and reasoning which we require as to valuation on the basis of the present record, or if it considers more information desirable, and in its discretion, it may open the record for further evidence or materials on that question. We

2. For the so-called cession tract, ceded in 1823 and containing 23,892,626 acres, the Commission found a fair market value of $12,500,000 (from which it deducted the consideration of $152,500 paid for that acreage). For the so-called reservation tract ceded in 1832 (containing 5,865,- 600 acres), the Commission found a value of $2,050,000, but gave the Indians nothing because the consideration paid for that tract was found to have been $2,094,-809.39. The final award was $12,347,-500, less offsets.

leave the extent of the further proceedings to the Commission.

The minor points raised by the Seminoles, not relating to valuation, are now ripe for decision by us, but we think it best to by-pass them for the time being since the issue of valuation dominates the case, and it will be better to dispose of the whole matter all at once if it comes here again. The remand will therefore be without prejudice to the right of the Indians to raise those issues again on any further appeal to this court.

■ The Government's cross-appeal revolves around a portion of the land awarded to the Seminoles by the Commission in the determination of liability which we affirmed in 180 Ct.Cl. 375. That particular area is claimed under the Claims Commission Act by both the Seminoles and the Creeks. The history of these overlapping claims, which have not up to now been consolidated, is set forth in McGhee v. United States, 437 F.2d 995, 194 Ct.Cl. 86 (1971) (Ind. Cl.Comm. Docket No. 280), in which we held that the Creeks were not precluded by the prior determination in favor of the Seminoles from pursuing their own claim to the overlapping territory. We said: "In order to protect itself, the Government, here a potential double payor, should have taken the initiative to consolidate. Had the cases been consolidated at the proper time all parties would have been bound by the ultimate judgment and needless litigation could have been averted." 437 F.2d at 1000, 194 Ct.Cl. at 94. Subsequently, the Government moved to remand the present Seminole case, before consideration or decision by the court of the instant appeals, so that the conflicting claims of the two groups could be jointly adjudicated by the Commission prior to our consideration of the Seminoles' appeal; this motion was denied by order of April 15, 1971.

In its cross-appeal the United States presses for the same relief of remand for consolidation, pointing out that since our order of April 15, 1971, the Creeks have made it very definite, before the Commission, that the area they are claiming overlaps, in substantial part, with that awarded to the Seminoles. It is absolutely clear that, if the Creeks prevail, they will recover for some of the same lands for which the Seminoles are scheduled to be paid under the outstanding judgment. It is also agreed that the two groups cannot both have been in exclusive and long-continued possession of the overlapping area at the time it came into the hands of the United States; the claims are mutually exclusive.

The Government was primarily responsible for the failure to consolidate the two claims prior to the Commission's adjudication of the Seminoles' case, but nevertheless we now sustain the cross-appeal, order the overlapping Creek (Docket No. 280) and Seminole claims consolidated, and remand this case so that those overlapping claims can be resolved in the consolidated proceeding. We take this course because it is now for the first time indisputable that there is such an overlap in claims and also, more importantly, because we are remanding the case on the Seminoles' appeal for further proceedings before the Commission. Since the case is not yet ended but must in any event proceed further, we think it just and appropriate to relieve the Government of the possibility of having to pay twice. The Seminoles will suffer the detriment of further litigation on the overlap, but that detriment is much mitigated by the fact that additional litigation will be required in any case by the remand we order on valuation. Moreover, since the case is not yet closed, no rights have vested and the Seminoles are not entitled to insist on the acreage determination (with respect to the overlap) in their favor if it turns out that the Creeks should be paid for that territory. Section 20(b) of the Indian Claims Commission Act, 25 U.S.C. § 70s(b), empowers the court "at any time [to] remand the cause to the Commission for such further proceedings as it may direct", and this appears to us a proper occasion

to exercise that power in the interests of justice. *Cf*. Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221 (1939). The Commission will, no doubt, arrange the further proceedings with respect to the overlap so as to minimize repetition to the extent feasible without cutting into any party's rights.

The case is, accordingly, remanded to the Indian Claims Commission for further proceedings in conformity with this opinion.

Remanded.

NICHOLS, Judge (concurring):

I join in the *per curiam* opinion but would like to add a few words in explanation of my position. This is, as the court states, the third recent big appeal from the Indian Claims Commission to be remanded for further findings as to valuation. According to 25 U.S.C. § 70v, as amended by P.L. 90–9, 81 Stat. 11, the existence of the Commission terminates ten years from and after April 10, 1962, a date now close at hand. Whether the Commission will live to do what we say it must do, and how the Congress will handle the situation, are matters for speculation. We need to be in the posture of knowing what we want and why, and being able to spell it out. The *per curiam* states what we are all agreed on, but if any individual judge has anything to add, I think he should add it.

We sometimes wear an appellate hat and sometimes not. This makes confusion easy, and renders it necessary to advert consciously to matters that may be assumed in the deliberation of Circuit Judges, who act in an appellate capacity nearly always. In this branch of our jurisprudence the Commission's findings are conclusive if supported by substantial evidence, thus our function here is appellate. We must take "due account" of the "rule of prejudicial error" and we may remand for such further proceedings as we may direct, 25 U.S.C. § 70s.

Making a value judgment as to the amount of compensation it is just, fair,

equitable, or reasonable for a claimant to receive, is a fact determination, which means the fact finder must do it and the appellate tribunal may not, within their respective jurisdictions. Newport News Shipbuilding & Dry Dock Co. v. United States, 374 F.2d 516, 179 Ct.Cl. 97 (1967). If, as in that case, there are guidelines for decision, prescribed by statute or regulation, the fact finding tribunal must show it has given them due regard. If it has not the appellate tribunal can only remand and not redo the job. A dissent in that case pointed out that the fact finder's decision had responded to the claimant's presentation. The majority did not deny this, but held that the findings left them powerless to determine if they were based on substantial evidence and incorporated no errors of law. Conversely, the parties here presented this case to us as if we were fact finders, but that did not justify our assuming that role. The parties cannot, together or separately, stipulate or concede the tribunals involved into performing parts other than the ones allotted to them by law. Our position reflects the restriction of the judiciary to its proper role, in which I strongly believe.

The adjudication in *Newport News* involved determining the reasonable level of profit on a Government contract, an assignment then still novel, considering the rate of adjustment of courts, law, and lawyers to new institutions. It had been therefore considered necessary to lay down guidelines, in the Armed Services Procurement Regulations. Valuation of a parcel of real estate as of a fixed past date is something we have had with us for a long time and think we know all about. On principle it is no different, but usually and in most cases a vast incrustation of judicial decisions of all dates is taken as a substitute for prescribed guidelines. The most important rules to be deduced from these decisions are summarized in Ch. XIV of Nichols on Eminent Domain (2d Ed.). Many are negative: one could observe them all and still not know how to ap-

praise any particular tract. For the most part, they are given effect in rulings admitting or excluding particular items of evidence. Many valuations, of course, are made by juries, and before them rules of evidence are applied with particular rigor. Juries do not have to give reasons for their decisions, as the Commission must. 25 U.S.C. § 70r. Rules of evidence thus are different from reasons, and substitute for them in jury cases. The Commission does not give reasons by displaying a record in which such rules of evidence, as are applicable to that class of case and tribunal, are observed.

A fact finding tribunal, which is not a jury, in a valuation case, must make an *informed* and *reasoned* determination. So far as the *informed* part of it is concerned, in these Indian claims, the antiquity of the valuation dates and the vast extent of the tracts to be valued, make guess, inference, surmise, and speculation large factors, even after all available historical and archival material has been assiduously raked together. What we think happened 150 years ago has to be largely mythical. The detailed findings before us here are, except as to certain issues reserved for later determination, as *informed* as they could be considering everything.

When the *information* is necessarily so loaded with subjective factors, the temptation is to shrug the shoulders and say it matters not if the *reasoning* is subjective too, and affirm on the basis of a "gut" feeling that $12,262,780 is enough, even without the 63¢. If this was all that was wanted, however, the Congress could just as well have spared us twenty-five years of Indian Claims Commission litigation. They could have appropriated a random lump sum for each tribe and offered it, take or leave, for a release of all claims. They did not adopt this approach, because, I suppose, they did not want it said they had voted out any gratuities. Elsewhere, perhaps, but not here. So the Indians were put to a standard of legal proof. Congress enacted this, and is paying for it, and is entitled to have the job done according to the standard it has prescribed.

In the context of ascertaining a fair and just price to be paid for services, or things, or land, what is a *reasoned* determination? It is easier to say what it is not. It is not an "intuitive leap" in the happy phrase of counsel in the *Nez Perce* case. It is not "navigating by the seat of the pants." It is not a figure arrived at by the fact finders gazing at the ceiling for an hour, then each setting down an amount of a piece of paper, then adding up their figures, then dividing by the number of fact finders. This last I suspect has been the real method of most value determinations since the law began to make them, but that does not make it right.

I would begin to see a *reasoned* determination if I saw one that had a tentative value or starting point. This might be a "sales index of value" as in the *Northern Paiute case, supra,* or in some Indian cases, the price at which the Government was selling public land to homesteaders, might be a good one. Then I would look for adjustments up or down, that needed to be made: for example, the Government might have been able to sell the homesteaders only land better than the land to be appraised, and something might have to be knocked off for that. The tentative value would go through several of these adjustments to arrive at an adjusted value. When, as here, the fact uncertainties were so great, it would probably be necessary to start, hypothetically from different tentative values assigned by different methods, and compare the adjusted values reached from each, to make the determined value. It would, with a large tract, likely be necessary to classify the land, into for example, timber, mineral, agriculture, or grazing land, according to its highest and best use, then determine a hypothetical value for each class, and compare the sum of these with the value proposed for the whole. Some computations might be improper as measures of value but helpful as tests: for example, as in the *Northern Paiute* case,

computations as to how much profit a mining company might derive from mining all the minerals estimated to be in the land, adjusted to whatever percentage of this profit it might be willing to share with the proprietor of the soil.

The "willing buyer" the "willing seller" and the "fair market value" are of course always utterly fictitious in these Indian cases, but that ought not to trouble us, for we have it on the authority of Nichols on Eminent Domain (2d Ed.), p. 664, that they are figments, even when it is a matter of determining a contemporary value for a tract of ordinary marketable size. Our "willing buyer", however, should be at least as plausible as a J. Fenimore Cooper character: he should have verisimilitude as one who, according to our more elevating myths, might possibly have walked the earth at the time and place involved. He might perhaps be a Daddy Warbucks projected back 150 years, but he could not be like real persons such as Andrew Jackson, David Crockett, Sam Houston, or Jim Fiske. What makes one "willing buyer" difficult to postulate and unhistorical is that he has got to be willing to pay the Indians fair value for their lands, though such were in fact obtainable by chicanery or force, for less or no outlay.

In land valuation cases we usually have expert witnesses: indeed, they are an indispensable aid to the fact finders, in Indian claims as in all others. They select tentative value figures after exhaustive fact investigation, adjust them as needed, test them as their skills and conscience prescribe, and arrive at final value estimates. They hope to have erected a model structure of reasoning the fact finders will adopt or imitate in all its parts in their own decision, but this rarely happens. The expert's opinion slants too much towards the litigation position of the side that employs him. Common sense tells the fact finders that "fair market value" must lie somewhere between the opposing estimates of the experts, and somewhat remote from both. This does not mean the expert's report must be rejected as worthless. If the man is any good at all, his report will be full of pertinent facts, pulled out of obscurity and thrust forward, techniques of use for testing the fact finder's value if not determining it, ideas, and intuitions. Thus, as pointed out in *Northern Paiute*, the fact finder is not required to choose between swallowing an expert's report whole, or rejecting it utterly, and usually, neither course is right. It appears to me, however, that an *informed* and *reasoned* determination will summarize the experts' offerings, acknowledge their value, indicate how they have been used, and also point out wherein they were rejected. If an expert's opinion is not followed, the trier of fact must see a fallacy in it somewhere and it is incumbent on him to point the fallacy out. Otherwise, his decision is not *reasoned*. Here the Commission did this only in a single illustrative instance, saying as to townsites, defendants were too pessimistic and plaintiffs too optimistic. 23 Ind.Cl.Comm. at 113. I do not think it is reasoning to explain the rejection of Professor A's figure merely by pointing out that Doctor B's is different. It may well be true, if both A and B were qualified, gave competent testimony, and based it on facts, the trier of fact might be able to select any figure between A's and B's, and have the support of substantial evidence. If he did this without explanation, he would not be making a *reasoned* determination. The requirement for support of substantial evidence, and for reasoning, are different and discrete, and we cannot affirm if we fail to find either in an appealed determination.

The reasoning, if stated, could be fallacious in our eyes and not necessitate reversal. The trier of fact is free to construct do-it-yourself guidelines when they are not laid down by authority. *Cf.* Bethlehem Steel Corp. v. United States, 423 F.2d 300, 191 Ct.Cl. 141 (1970). It is thus the prerogative of the trier of fact to decide how to use his underlying facts, and what ultimate conclusions to draw from them. If he is

not arbitrary or capricious, if reasonable people could reason as he does in good faith, it is not for us to say we disagree.

The requirement addressed to us, that we take due account of the rule of prejudicial error, remains to take up. I suppose it means we must not reverse for harmless error, but here we are not reversing, only remanding as we are authorized to do. There is, I believe, no doubt that a party is prejudiced if the trier of fact makes a value determination without divulging reasons. It may not know it is prejudiced, or may state its opinion it is prejudiced in other terms, especially if the trier of fact is not a tribunal of general jurisdiction, but is deemed to possess expertise. Appellant's assignment IX reads:

The Commission Erred in that the Ultimate Findings on Value are not Supported by the Primary Findings

If this alleges the ground we rely on, at all, it does so in an unartful manner, and the argument in support of the proposition does not at all rest on our ground. However, the *Newport News* case stands for the proposition that failure to make a *reasoned* value determination by applicable standards is prejudicial even though the aggrieved party has not informed the trier of fact it was making a mistake and has, indeed, contributed to the error.