**ANCHOR ESTATES, INC.**

v.

**The UNITED STATES.**

**DAKOTAVILLE, INC.**

v.

**The UNITED STATES.**

**Nos. 228–81L, 229–81L.**

United States Claims Court.

March 20, 1986.

William R. Mills, Bismarck, North Dakota, for plaintiff. Sherry Mills Moore, of counsel.

Fred R. Disheroon, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, for defendant. Lawrence W. Puckett, of counsel.

YOCK, Judge.

This case comes before the Court in a suit under 28 U.S.C. § 1491 (1982) for a fifth amendment taking by inverse condemnation. Anchor Estates, Inc. ("Anchor") and Dakotaville, Inc. ("Dakotaville") each filed separate complaints in this Court's predecessor, the U.S. Court of Claims, on April 13, 1981, which were subsequently consolidated, and on October 1, 1982, transferred to the U.S. Claims Court pursuant to the Federal Courts Improvement Act of 1982. The defendant has now filed a motion for summary judgment to which the plaintiffs have responded contending that genuine issues of material facts remain unresolved. After carefully reviewing the entire record including the briefs and other evidentiary matters submitted, this Court concludes that the defendant's motion for summary judgment should be denied.

### Background

The plaintiffs, corporations organized under the laws of the State of North Dakota, are owners of several parcels of land situated on the east bank of the Missouri River near the City of Bismarck, North Dakota. This riparian land is located approximately 70 miles downstream from the Garrison Dam and approximately 240 miles upstream from the Oahe Dam. Anchor is the owner in fee simple of Lots 5 and 6 of Section 29, Township 138, Range 80, west of the 5th principle meridian, in Burleigh County, approximately 7 miles southwest of Bismarck and consisting of approximately 190 acres. Dakotaville is the owner in fee simple of Lots 1, 2, 3 and 4 of Section 7 and land on Section 8 west of Dakotaville Drive in the same township and range, and is approximately 2 miles southwest of Bismarck with approximately 300 acres of land.

Anchor and Dakotaville each allege that certain land above the ordinary high water mark on their property has been taken by a flowage easement due to frequent and recurring surface flooding of the land and groundwater inundation. Both contend that the taking is the natural consequence of the defendant's control of the flow of the Missouri River through the Garrison and Oahe Dams. The plaintiffs further argue that the flooding is caused by a "backwater effect" that occurs when water backs up from the Oahe Dam to the plaintiffs' property, thereby raising the water table on the surrounding land and preventing proper drainage. Also plaintiffs complain of increased deposits of sediment raising the level of the river.

In addition to the above, plaintiff Dakotaville contends that many acres of its riparian land above the ordinary high water mark have been taken by erosion. This erosion is allegedly the result of defendant's construction of rock jettys on the west bank of the Missouri opposite the plaintiff's Dakotaville property. Alleged further causes of erosion are the defendant's removal of sediment in the river between the dams (leaving clear water which is able to carry away plaintiff's land at a higher rate), and the hourly fluctuation of the river level in the process of generating power in defendant's hydroelectric plant at the Garrison Dam. Finally, plaintiff contends that the former natural erosion and accretion cycle of the Missouri River has been disrupted due to the nature of the defendant's flow management of the Riv-

er's main stem system, resulting in irreplaceable erosion of its land.

In defendant's motion for summary judgment, the Government has vigorously disputed virtually every contention presented by the plaintiffs. Defendant asserts that plaintiffs' properties are located within the Missouri River flood plain and, prior to the construction of Garrison Dam, flooding of the land in question occurred virtually every spring. Major, substantial, and damaging flooding occurred in many years. Defendant asserts that the Garrison Dam was constructed as a flood control measure and has in fact virtually *eliminated* the frequently occurring, severe flooding of the river in its natural, unregulated state. The defendant continues by summarily dismissing plaintiffs' asserted cause of the flooding (*i.e.,* backwater effect and prevention of proper drainage), as "utterly without factual basis." The defendant argues that the minimal backwater effects from Lake Oahe upon plaintiffs' properties (1.0 foot higher level at Dakotaville's property and 1.5 feet higher level at Anchor Estates' property) and the slightly increased ground water elevation caused by the Oahe Dam have no adverse effects. Defendant continues by asserting that plaintiffs' contention that the river level adjacent to their properties was increased by aggradation or accumulation of sediment as a result of the operation of both dams is baseless. No long-term aggradation has occurred in this reach or section of the Missouri River because the reach comprises a "null zone" in the river's deposition/scour process in which neither aggradation or degradation is occurring. Finally, the defendant argues that the construction of stabilization structures (the revetment and jettys) has not only *not* caused erosion of the Dakotaville property, but has substantially *reduced* its earlier significant rate of erosion. Defendant has pointed out that since the stabilization structures were built in 1972, a total of 0.5 acres of Dakotaville's property have eroded; prior to that time, between 1960 and 1972, 35 acres eroded. Finally, defendant asserts that there is no factual basis for Dakotaville's claim that hourly flow fluctuations cause increased erosion, since the one foot normal daily stage (river height) fluctuation adjacent to the property has no measurable impact on erosion of the land.

In support of its summary judgment motion, the defendant has relied almost totally on three expert reports. The first expert was a civil engineer/supervisor working for the U.S. Army Corps of Engineers with a specialization in hydraulic and river engineering. In his affadavit, he discussed the effect of the bank stabilization structures constructed on or close to the Dakotaville property (revetments, dikes, channel blocks), and opined that the construction did not increase the erosion rate on the property and actually protected most of the property from erosion. The second expert was a professional historian who researched the history of flooding of the Missouri River near Bismarck, North Dakota, from earliest times to the present dates. He chronicled the damaging floods that would occur virtually every year in the Bismarck area prior to the construction of the Garrison Dam. The third expert was another civil engineer who holds degrees in environmental and hydraulic engineering. He prepared graphs and gave his opinion that the Garrison Dam had almost eliminated damaging flooding in the Bismarck area.

## Discussion

In contrast to the factual disputes presented, the legal principles to be applied here are fairly clear. An action for inverse condemnation arises under the fifth amendment to the U.S. Constitution's requirement for payment of just compensation when acts of the Government not formally labeled eminent domain have the effect of such an exercise over the property in question. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir.1983); *Eyherabide v. United States,* 170 Ct.Cl. 598, 600–01, 345 F.2d 565, 567 (1965); *Schultz v. United States,* 5 Cl.Ct. 412, 415 (1984). Specifically, in a situation where works constructed by the Government on land owned or controlled by it cause the

land of another to be subject to intermittent, frequent, and inevitably recurring floodings, it is held that the Government thereby takes a flowage easement over the affected land and must pay just compensation under the Constitution for the easement. *United States v. Cress,* 243 U.S. 316, 318, 328–29, 37 S.Ct. 380, 381, 385, 61 L.Ed. 746 (1917). *See also Barnes v. United States,* 210 Ct.Cl. 467, 474–75, 538 F.2d 865, 870 (1976); *Baird v. United States,* 5 Cl.Ct. 324, 328 (1984).

The standards for determining a motion for summary judgment in the case at bar are also clear:

> (b) For Defending Party. A party against whom a claim or counterclaim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

> (c) Motion and Proceedings Thereon. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.* A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

RUSCC 56 (emphasis added). *See also Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972); *South Louisiana Grain Services v. United States,* 1 Cl.Ct. 281, 289 (1982); *Schultz, supra,* 5 Cl.Ct. at 416.

As a general rule, caution must be exercised in a decision to grant a motion for summary judgment. The Court of Appeals for the Federal Circuit has held that:

> Though speedy and inexpensive, summary judgment is nonetheless a "lethal weapon" capable of "overkill." *Brunswick v. Vineberg,* 370 F.2d 605, 612 (5th Cir.1967). *See generally,* Louis, *Federal Summary Judgment Doctrine: A Critical Analysis,* 83 Yale L.Rev. 745 (1974). It denies the non-movant its "day", i.e. a trial, in court. Moreover, experience has shown that a trial often establishes facts and inferences not gleanable from papers submitted pre-trial.

*SRI International v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1116 (Fed.Cir.1985).

More specifically, the Federal Circuit has urged this Court to be very cautious when asked to grant summary judgments in taking cases. The court has stated:

> The fact-intensive nature of just compensation jurisprudence to date, however disorienting in other contexts, argues against precipitous grants of summary judgment. There may well be just compensation cases in which the United States as the moving party is "entitled to judgment as a matter of law, and where it is quite clear what the truth is...." *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944). There may be such cases. This is not one of them.

\* \* \* \* \* \*

> The grant of summary judgment where a trial would be fruitless and the moving party is clearly entitled to judgment as a matter of law serves an exemplary role in the judicial process. Because the remedy can be harsh in its finality, however, its application must be accompanied by great care in respect of the entire record and the relevant law.

*Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887, 891 (Fed.Cir.1983).

The burden of showing an absence of genuine issues as to any material facts in this case falls on defendant, as the movant for summary judgment. *Adickes v. Kress,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). This burden was not met for several reasons. First, the bulk of defendant's evidence to support its motion for summary judgment is expert witness opinion/testimony. Foreclosing the plaintiff's "day in court" results in the loss of any opportunity to cross-examine these key

witnesses about their qualifications or to dig deeper into the basis for their opinions than the plaintiff can now do in light of the available supporting materials.

In addition, this Court is concerned about the loss of its opportunity to ask questions of the defendant's experts to clarify its understanding, if necessary, of this highly technical, fact-intensive case *before* making its ultimate decision. It is, of course, quite true that the Court need not accept an expert's report whole or even partially. It may reject some part or all of the report or opinion if such report or opinion does not conform to its considered judgment based upon all of the evidence available to it. *Seminole Indians of Florida v. United States*, 197 Ct.Cl. 350, 361, 455 F.2d 539, 545 (1972); *Navajo Tribe of Indians v. United States*, 9 Cl.Ct. 336, 439 (1986).

Finally, taking cases in general are extremely *fact-intensive*, and the case at bar is no exception. This characteristic alone strongly militates against the case's disposal by summary judgment. *Yuba Goldfields, Inc. v. United States, supra*, 723 F.2d at 887.

In view of the above discussion, this Court concludes that the Defendant's Motion for Summary Judgment should be denied, and that the matter should go forward to trial.

## CONCLUSION

For the reasons stated in the opinion, the Court denies the defendant's Motion for Summary Judgment.

Having denied the Defendant's Motion for Summary Judgment, the Court notes that this matter has been on its docket since April 13, 1981, some five long years. Thus, the parties have had ample and sufficient time to complete discovery and prepare for trial on all issues of liability and damages. This being the case, the Court hereby orders:

(1) the parties shall complete all loose-end discovery on or before June 23, 1986, and will file a status report on or before that date;

(2) a pretrial conference is scheduled for July 24, 1986, to be held at the National Courts Building, Washington, D.C.;

(3) trial is set to commence on Tuesday, September 9, 1986 in Bismarck, North Dakota.

IT IS SO ORDERED.