COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| THE CITY OF EL PASO, TEXAS, | § | No. 08-11-00233-CV |
| Appellant, | § | Appeal from |
| v. | § | 327th District Court |
| MAZIE'S, L.P. and WHITNEY PROPERTIES, L.P., | § | of El Paso County, Texas |
| Appellees. | § | (TC # 2008-2582) |

**O P I N I O N**

The City of El Paso has brought this accelerated appeal from an order denying its plea to

the jurisdiction. For the reasons that follow, we affirm.

**FACTUAL SUMMARY**

The Coronado Country Club, built in the 1950's, is located on the west side of El Paso,

Texas. Developers filled large natural arroyos[1] passing through and near the country club and

constructed an earthen diversion dam to reroute and drain water into a smaller arroyo (Arroyo

8B) to the south. As developers created new residential neighborhoods in this same area, they

continued the practice of diverting water from larger natural arroyos into the man-made drainage

system. The City approved the plans for the diversion dam and drainage system. The City owns,

operates, and maintains the diversion dam and the drainage system.

John Walton, Ph.D. is a civil engineering professor at the University of Texas at El Paso.

In 2004, Dr. Walton decided to review the drainage systems because new development was

---

[1] An arroyo is a natural watercourse or gulch in an arid region and is usually dry except after rains. *Ehler v. LVDVD, L.C.*, 319 S.W.3d 817, 825 (Tex.App.--El Paso 2010, no pet.).

being planned in Arroyo 4A located behind his home.  He examined the FEMA maps for Arroyos 4A and 8B and topographic maps for the area.  He also made visual observation of the diversion dam and became concerned that it might fail in a large storm event.  After reviewing the FEMA maps, the published drainage areas in the FEMA documents, the published flow rates, and the continued development in the watershed, Dr. Walton concluded that the published FEMA peak flow rates were erroneous.  It became apparent to him that the drainage system in Arroyo 8B was under-designed and was unlikely to survive a large storm.  In late December 2004, Dr. Walton sent a letter to FEMA and the U.S. Army Corps of Engineers expressing his concerns about these potential drainage problems.  He hand-delivered a copy of the letter to El Paso's City Engineer, Rick Connor.  Dr. Walton's letter addressed "irregularities in the drainage system for the Arroyos originating above the Coronado Country Club in West El Paso, Texas and ending mostly at the Keystone Dam and Oxidation Pond (FEMA Arroyos 4 and 8)."  Dr. Walton first expressed his concerns about deficiencies in the diversion dam and associated structures which could lead to failure of the diversion system.  He stated that if this structure failed, the flow rates down Arroyo 4 "may greatly exceed the published FEMA design flows for the arroyo" and he expressed his concern that a failure to address these issues may lead to an undue risk to safety and property during a large storm event, a 100-year or greater storm.

Dr. Walton's letter addressed a second area of concern about the drainage system just to the south (Arroyo 8B).  He stated that even if the diversion structure were shown to be adequate, or reinforced until it was adequate, he was still concerned that Arroyo 8B "will be forced to deal with a greater storm surge than initially anticipated, a storm surge which appears to exceed current FEMA/FIRM calculations which apparently do not include flow from the diversion dam."  This increased flow runs into the drainage canal just above Mesa Street between the

- 2 -

building holding Western Beverages, Blockbuster, Sun Harvest, and Kentucky Fried Chicken and the drainage canal did not appear adequate to handle the increased flow caused by the diversion dam and the new upstream development which has occurred in the drainage basin during the past twenty years. Dr. Walton called for a full engineering study to be done on the diversion dam and associated structures and he suggested that the FEMA maps and design flows be corrected to reflect the "lost" water from South Franklin Mountains. He also recommended that the drainage systems for Arroyos 4 and 8 be checked for adequacy.

Walton subsequently met with Connor and an engineer from the City, Bashar Abugalyon, at the site of the diversion dam. Connor and Abugalyon did not engage in any substantive discussion with Dr. Walton about the engineering concerns and Connor "expressed his disdain for academics who in his opinion, do not live in the real world." Appellees, Mazie's L.P. and Whitney Properties, L.P., owned some of the commercial property, including the Blockbuster Video store, mentioned in Dr. Walton's letter as being at risk. In late July and early August of 2006, El Paso experienced significant rainfall and the drainage canal above Mesa Street failed as did other portions of the drainage system above it. The floodwaters totally destroyed the Blockbuster store as well as nearby buildings and homes. Appellees filed suit against the City alleging a nuisance claim and takings claim under Article I, Section 17 of the Texas Constitution and a takings claim under the Fifth Amendment to the United States Constitution. The City filed a plea to the jurisdiction based on governmental immunity to suit. Both sides submitted evidence in support of their respective positions on the issues raised by the City's plea. Following a hearing, the trial court denied the plea and this appeal followed.

**EVIDENTIARY COMPLAINTS**

The City and Appellees each raise complaints about the trial court's ruling on objections

to evidence. The City makes a conditional complaint in its brief about the trial court's ruling on its objections to Dr. Walton's affidavit:

> To the extent [Appellees] may seek to construe the affidavit to make statements about what the City *actually* knew or intended, the affidavit is objectionable for lack of factual predicate, speculation, and other objections raised by the City. *See* CR: 272-74. In regard to any such construction of the affidavit, the trial court's overruling of the City's objections, *see id.*, was an abuse of discretion made without reference to guiding principles and which was reasonably calculated to cause and probably did cause rendition of an improper judgment and was such that the entire case turned on it. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex. 1992); *Benavides v. Cushman, Inc.*, 189 S.W.3d 875, 879 (Tex.App.--Houston [1st Dist.] 2006, no pet.).

The complaint is not raised as a separate issue in the brief, but is instead found in a footnote.

Rule 38.9 requires the court to construe briefs liberally. *See* TEX.R.APP.P. 38.9. We recognize that the current Rules of Appellate Procedure provide litigants with some degree of leeway in the statement of issues raised on appeal, but we do not believe it is appropriate to raise a complaint about the admission of evidence in a footnote. *See* TEX.R.APP.P. 38.1(f)("The brief must state concisely all issues or points presented for review. The statement of an issue or point will be treated as covering every subsidiary question that is fairly included."). The City has not provided any argument or authority relevant to its objections based on lack of factual predicate and speculation. *See* TEX.R.APP.P. 38.1(i)(requiring an appellant's brief to contain clear and concise arguments "with appropriate citations to authorities"); *see also Fredonia State Bank v. General American Life Insurance Company*, 881 S.W.2d 279, 284-85 (Tex. 1994)(appellate court has discretion to find error waived due to inadequate briefing). Finally, the City's reference to "other objections" made in the trial court is wholly inadequate to raise any additional arguments on appeal and certainly does not substitute for briefing the issue. For these reasons, we find that the City has waived its complaints about Dr. Walton's affidavit.

Appellees attempt to raise an issue regarding the trial court overruling their objections to the affidavit of City Engineer Alan Shubert. Like the City, Appellees state this issue in a footnote in their brief as follows:

> Appellees objected to Mr. Shubert's testimony in the trial court to the extent he was testifying in reliance on statements made to him by other city employees. The trial court improperly overruled those objections, and appellees assert that improper ruling as error. First, Mr. Shubert would lack personal knowledge. *See Kerlin v. Arias*, 274 S.W.3d 666, 668 (Tex. 2008); TEX.R.EVID. 602. Second, statements made by other employees would constitute hearsay. *See* TEX.R.EVID. 801, 802. Thus, the trial court abused its discretion in overruling the objections. In any event, even if admitted, the affidavit fails to state the facts necessary to rebut appellees' allegations.

Again, we believe it is inappropriate to raise an issue in a footnote. *See* TEX.R.APP.P. 38.1(f). Even if Appellees had properly raised this complaint in an issue or point in their brief rather than a footnote, we would not address the merits because it is waived. First, Appellees did not raise a hearsay objection in the trial court. *See* TEX.R.APP.P. 33.1(a)(1). Second, Appellees directed their lack of personal knowledge objection at the entire affidavit and did not identify the objectionable portions. *See General Motors Corporation v. Harper*, 61 S.W.3d 118, 126 (Tex.App.--Eastland 2001, pet. denied)(when part of a document contains hearsay and part of it is admissible, the objection to that evidence should point out the statements claimed to be hearsay and specifically object to those statements).

## PLEA TO THE JURISDICTION

In Issue One, the City contends that the trial court erred by denying its plea to the jurisdiction. The City offers multiple arguments under this issue which we have designated as sub-issues one through seven.

### *Standard of Review*

A plea to the jurisdiction is a dilatory plea by which a party challenges the court's

authority to determine the subject matter of the action. *Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004); *Bland Independent School District v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). The plaintiff bears the burden to allege facts affirmatively demonstrating that the trial court has subject matter jurisdiction. *Texas Department of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001). Whether a party has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction and whether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction are questions of law which we review *de novo*. *Texas Department of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *Texas Natural Resource Conservation Commission v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002).

When a plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court must review the relevant evidence to determine whether a fact issue exists. *Miranda*, 133 S.W.3d at 226. When reviewing a trial court's ruling on a challenge to its jurisdiction, we consider the plaintiff's pleadings and factual assertions, as well as any evidence in the record that is relevant to the jurisdictional issue. *City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625 (Tex. 2010); *Bland ISD*, 34 S.W.3d at 555. If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea, and the issue must be resolved by the trier of fact. *Miranda*, 133 S.W.3d at 227-28; *see City of Elsa*, 325 S.W.3d at 626. On the other hand, if the evidence is undisputed or fails to raise a fact question, the trial court must rule on the plea as a matter of law. *Miranda*, 133 S.W.3d at 228.

Article I, Section 17 of the Texas Constitution provides that: "No person's property shall be taken, damaged or destroyed or applied to public use without adequate compensation being made, unless by the consent of such person . . . ." TEX.CONST. art. I, § 17. "Taking," "damaging," and "destruction" of one's property are three distinct claims arising under Article I, Section 17. *City of Dallas v. Jennings*, 142 S.W.3d 310, 313 n.2 (Tex. 2004); *Steele v. City of Houston*, 603 S.W.2d 786, 789-791 (Tex. 1980). Courts use the term "taking" as a shorthand to refer to all three types of claims. *Jennings*, 142 S.W.3d at 313 n.2. This case concerns the damage to and destruction of Appellees' property.

Governmental immunity protects political subdivisions of the State such as counties, cities, and school districts from lawsuits for damages. *Harris County Hospital District v. Tomball Regional Hospital*, 283 S.W.3d 838, 842 (Tex. 2009); *Reata Construction Corporation v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006); *Wichita Falls State Hospital v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003). The City does not have immunity from a valid takings claim. *See General Services Commission v. Little-Tex Insulation Company, Inc.*, 39 S.W.3d 591, 598 (Tex. 2001); *see Texas Parks and Wildlife Department v. Sawyer Trust*, 354 S.W.3d 384, 388 (Tex. 2011)(stating that when the State or a state agency has taken a person's property for public use, the State's consent to suit is not required; the Constitution grants the person consent to a suit for compensation). If the plaintiff fails to allege a valid takings claim, the City retains its immunity from suit. *See Little-Tex Insulation*, 39 S.W.3d at 598; *City of Dallas v. Blanton*, 200 S.W.3d 266, 272 (Tex.App.--Dallas 2006, no pet.).

*Allegation of Specific Act Related to Maintenance or Operation*

A takings claim consists of three elements: (1) an intentional act by the government

under its lawful authority, (2) resulting in a taking, damaging, or destruction of the plaintiff's property, (3) for public use. *Little-Tex Insulation Company*, 39 S.W.3d at 598; *City of El Paso v. Ramirez*, 349 S.W.3d 181, 186 (Tex.App.--El Paso 2011, no pet.). In its first sub-issue, the City argues that Appellees have failed to allege that it engaged in a specific act which resulted in the taking, damaging, or destruction of Appellees' property. This portion of the City's argument focuses primarily on the sufficiency of Appellees' pleadings. The Supreme Court has recognized that a person's property may be taken, damaged, or destroyed and therefore require compensation if an injury results from either the construction of public works or their subsequent maintenance and operation. *City of Tyler v. Likes*, 962 S.W.2d 489, 504-05 (Tex. 1997), *citing Hidalgo County Water Improvement District No. 2 v. Holderbaum*, 11 S.W.2d 506, 507 (Tex.Comm'n App.1928, judgm't adopted). Consistent with these decisions, Appellees have alleged in their third amended petition that the City's construction, operation, and maintenance of the diversion dam and drainage system damaged their property.

The City nevertheless maintains that Appellees' takings claim "is based--not on *construction* of the drainage system--but rather on *maintenance/operation* of the system, i.e., a purported 'policy' of continuing to divert water into the system after being 'warned' there might be a problem." The City's argument is based on the opening paragraph in Appellees' third amended petition:

> This case arises from the City of El Paso's decision to protect affluent residential property owners from the possibility of flood waters flowing naturally through their neighborhoods by diverting those waters to a drainage system that inevitably caused flooding of nearby commercial properties. A civil engineering professor warned the City of the likely flooding almost two years before it occurred. But the City ignored him and continued its diversion of the floodwaters, choosing to protect certain property owners at the expense of others.

In determining whether Appellees have stated a valid takings claim, we do not restrict our

analysis to a single paragraph in the petition. Appellees allege that their property damage was caused by a diversion dam, detention pond, and drainage system constructed, operated, and maintained by the City of El Paso and they allege facts regarding the initial construction of the diversion dam and drainage system. The petition also alleges that over the years, the City "continued its practice of diverting water from the natural arroyos to the man-made drainage system" as new residential neighborhoods were developed in the same area. Appellees further contend that the City's diversion of floodwaters changed the amount and character of those waters by massively and intentionally increasing their volume, force, and velocity. We do not construe the pleadings as being based solely on the City's "policy" of diverting floodwaters. To the contrary, Appellees allege that their property damage was caused by a diversion dam, detention pond, and drainage system constructed, operated, and maintained by the City.

The City next contends that a claim based on the maintenance or operation of a public work must involve a specific act such as releasing water from a control gate or unclogging a sewer line. It argues that "mere responsibility for maintenance or operation of a public work--even one which inherently causes occasional flood--does not constitute a taking." The City cites *City of Arlington v. State Farm Lloyds*, 145 S.W.3d 165, 168 (Tex. 2004) in support of its argument. There, raw sewage backed up into a home on two occasions causing significant damage. *City of Arlington*, 145 S.W.3d at 166. The homeowners' insurer, State Farm, paid the homeowners for the damages and brought a subrogation suit against the City of Arlington to recover the monies paid, alleging that the City's operation of the sewer lines constituted a nuisance and an unconstitutional taking under Article 1, Section 17. *Id.* State Farm did not allege that the City operated the sewer improperly; instead, it argued that "backups of raw, noxious sewage into private residences" are "inherent in the nature" of sewer systems. *Id.* It

argued that the City should be liable for the damage caused by the sewer system because the City intentionally maintained the system for the benefit of its citizenry, knowing that backups such as the ones involved in the case are inherent in the operation of sewer systems. *Id.* A jury found that the sewer system created a nuisance that proximately caused damages to the house, and that the second sewage flood (but not the first) constituted a taking of property by the City of Arlington. *Id.* at 167. The Fort Worth Court of Appeals found that the City of Arlington waived the issues presented on appeal due to inadequate briefing. *City of Arlington v. State Farm Lloyds*, 141 S.W.3d 216, 218 (Tex.App.--Fort Worth 2003). The Supreme Court first determined that the City of Arlington's issues were not waived. *City of Arlington*, 145 S.W.3d at 167-68. It then held, citing *City of Dallas v. Jennings*, 142 S.W.3d 310 (Tex. 2004), that mere intentional operation of a sewer system is insufficient to support liability for a takings claim under Article I, Section 17. The court reviewed the evidence and found there was no evidence that the City of Arlington knew a specific act was causing identifiable harm or knew that the specific property damage is substantially certain to result from an authorized government action. *City of Arlington*, 145 S.W.3d at 168. Thus, the court held the City of Arlington did not engage in an unconstitutional taking. *Id.* The instant case is distinguishable. First, *City of Arlington* was in a different procedural posture because the Supreme Court was reviewing the sufficiency of the evidence following a jury trial. This case is before us on appeal from the trial court's order denying the City's plea to the jurisdiction. Second, Appellees here never alleged that occasional flooding is inherent in the nature of the diversion dam and drainage system, and therefore, the City should bear the expense. To the contrary, Appellees alleged that the City intentionally chose, through the construction and operation of the diversion dam and drainage system, to divert water from natural arroyos into a man-made drainage system knowing that the damage to

Appellees' property was substantially certain to result from this authorized government action. Accordingly, we conclude that *City of Arlington* does not support the City's argument.

Citing *AN Collision Center of Addison, Inc. v. Town of Addison*, 310 S.W.3d 191 (Tex.App.--Dallas 2010, no pet.), the City also contends that the flooding of Appellees' property did not result from its maintenance or operation of the diversion dam and drainage system because the water flows down the drainage structures without human intervention. There is no evidence in the record supporting the City's assertion that the diversion dam and drainage system do not require any routine action on the part of city employees. For this reason alone, the City's argument is without merit. Further, the *Collision Center* decision does not support the City's argument.

Collision Center purchased real property near the Addison Airport and began operating a vehicle paint and body repair shop on that location. *Id.* at 192. It filed suit against Addison alleging that its premises had flooded numerous times because Addison diverted or impounded rainwater from the airport. *Id.* The petition alleged that because Addison intentionally diverted the water and with knowledge that the flooding of Collision Center's property would occur, the damage to the property constituted a taking in violation of Article I, Section 17. *Id.* Collision Center further argued that Addison's diversion of water was a compensable nuisance under Article I, Section 17. *Id.* Addison filed a traditional and no-evidence motion for summary judgment. *Id.* The trial court granted the motion without specify the basis for the ruling. *Id.* at 192-93. On appeal, Collision Center did not challenge every ground on which summary judgment could have been granted and only challenged the summary judgment on its request for abatement of the nuisance. *Id.* at 193. Consequently, the Dallas Court of Appeals considered whether any of the unchallenged grounds supported summary judgment on Collision Center's

request for abatement of the nuisance. *Id.* at 193-94.

The court addressed whether the trial court properly granted summary judgment under Rule 166a(i) on the ground that the Collision Center did not have any evidence that Addison performed any intentional act that damaged Collision Center. *Id.* at 194. The opinion does not state what Collision Center alleged in its pleadings, but Collision Center argued that Addison had knowledge that the development and alteration of the natural landscape of the airport caused the flood on Collision Center's property. *Id.* at 194. It also argued that Addison knew that the flooding was substantially certain to continue unless Addison acted to alleviate the diversion of rainwater. *Id.* The evidence showed that private parties built the Addison Airport in 1956 and Addison purchased it in 1976. *Id.* at 192. There was evidence that the flooding occurred as the result of the original construction of the airport twenty years before Addison purchased it. *Id.* at 194. The appellate court noted there was no evidence that an act by Addison caused the flooding on Collision Center's property. *Id.* Further, Collision Center produced no evidence that the maintenance and operation of the airport caused the flooding of its property. *Id.* at 194-95.

The City focuses on the statement that: "Collision Center *has not alleged*, nor produced any summary judgment evidence of, an act by Addison that caused the flooding on Collision Center's property." [Emphasis added]. *Id.* The statement must be considered in the context of the issue being addressed by the court of appeals. The court was not reviewing a plea to the jurisdiction where the focus is on the plaintiff's pleadings and the jurisdictional evidence but instead was reviewing whether the plaintiff had produced any evidence in response to a no-evidence summary judgment motion. In such a case, the burden was on the plaintiff to produce a scintilla of evidence to avoid summary judgment under Rule 166a(i). Here, Appellees have alleged that the City's construction, maintenance, and operation of the diversion dam and

drainage system caused the flood which damaged their property. They also allege that increased diversion of new water from new development in the area created a situation where a large storm event would overwhelm the capacity of the man-made drainage system to transport floodwaters away from all residential and commercial property. We conclude that Appellees' pleadings state a valid takings claim under Article I, Section 17. The City's first sub-issue is overruled.

*Intentional Act*

In sub-issue two, the City argues that the evidence establishes it did not know flooding was substantially certain to occur. If the City is correct, Appellees have alleged only a negligence claim, not a taking. *See Tarrant Regional Water District v. Gragg*, 151 S.W.3d 546, 555 (Tex. 2004)(stating that intent is the factor which distinguishes a takings claim from a negligence action); *Likes*, 962 S.W.2d at 505 (stating that mere negligence which eventually contributes to the destruction of property is not a taking). When a governmental entity physically damages private property in order to confer a public benefit, that entity may be liable under Article I, Section 17 if it (1) knows that a specific act is causing identifiable harm; or (2) knows that the specific property damage is substantially certain to result from an authorized government action -- that is, that the damage is necessarily an incident to, or necessarily a consequential result of the government's action. *Jennings*, 142 S.W.3d at 314.

Appellees alleged in their third amended petition that Dr. Walton wrote a letter in December 2004, which he delivered to City Engineer Rick Connor, expressing his concerns about the detention dam and drainage system. Dr. Walton explained that the drainage system could not handle the increased water flow from the diversion dam and new development and he warned that the system could fail during a large storm event. Dr. Walton identified Appellees' property as being at particular risk. Appellees specifically alleged that: "The City knew

- 13 -

flooding of certain property in the area near Mesa Street was substantially certain to occur because it was necessarily incident to and a consequential result of the intentional diversion of surface waters." The City offered the affidavit of the City Engineer, Alan Shubert, in support of its plea to the jurisdiction. At the time he provided the affidavit in February 2011, Shubert had been the City Engineer for four years. Shubert's affidavit states the following with respect to the City's knowledge:

> Nor did [the City] know its acts were substantially certain to result in property damage or that property damage was necessarily incident to or necessarily a consequential result of its actions. Rather, the goal of the drainage system was to protect all private properties in the relevant area--including Plaintiffs' properties--by diverting surface water away from them. Due to highly unusual rainfall on August 1, 2006, and ground saturation from prior extensive heavy rains, the drainage system unexpectedly failed at certain points.

The City also relied on the deposition testimony of Bashar Abugalyon, a hydraulic engineer employed by the City. Abugalyon testified that he had "no concerns" about the box culvert which overflowed onto Appellees' property. According to Abugalyon, the drainage system had been designed under a 100-year flood standard whereas the August 1, 2006 rainfall was "almost like a 500-year flood."[2] Appellees responded to this evidence by offering the affidavit of Dr. Walton. He stated, in paragraphs 3, 4, and 5 that:

> 3. The situation that existed is described in my attached January 2007 report, Exhibit 'C'. Water from arroyos on the mountainside above the diversion dam were diverted into the area running down what is now Silver Springs Drive in order to protect the Coronado Country Club development. Later developments to the South led to increased run off from new subdivisions with no controls for the downstream flood damage risk it would increase. The City did not require the developers to take into account the increased water flows and the limited capacity of the old drainage system below. The City made choices that benefitted newer subdivisions and put the commercial buildings and older neighborhoods below at high risk of flood damage. The August 1, 2006 flood resulted in damage that was apparent in advance to any civil engineer.

---

[2] Abugalyon had no data or calculations to support his statement that the storm event was a 500-year flood and he said that he based his belief on what "we heard from the news and media, and everybody . . . ." Dr. Walton testified that the storm was within the 100-year event that the drainage system is designed to handle.

4.  Mr. Connor and Mr. Abulguyon [sic] did not engage in any substantive discussion with me about the engineering concerns.  Mr. Connor expressed his disdain for academics who in his opinion, do not live in the real world.  The choices the City made put the public at great risk.  Some of those risks were realized on August 1, 2006.  It is a wonder no one died.

5.  I know it is not up to me to take the place of a jury in deciding intent, but from an engineering standpoint the risks taken by the City were obvious and made to favor newer developments up the mountain by jeopardizing the safety of older commercial and residential subdivisions.  The old channel behind Sun Harvest could not handle the water willfully diverted into it from four mountainside arroyos as well as the increased runoff from newly developed areas and it did not.  The new Blockbuster building was lost as a result.

The foregoing evidence establishes that a fact issue exists with respect to whether the City knew flooding of certain property in the area near Mesa Street was substantially certain to occur as a result of the intentional diversion of surface waters.  The City's second sub-issue is overruled.

*Failure to Act*

In its third sub-issue, the City contends that Appellees' takings claim is based on an alleged failure to act.  In making this argument, the City asserts, as it did in the first sub-issue, that Appellees' takings claim is not based on construction, but is instead based on the City's policy of continuing to divert water into the system after being warned there might be a problem. We disagree with that contention for reasons already stated in the opinion.

The City is correct, however, that a failure to act cannot be construed to be an intentional act resulting in damage to Appellees' property.  *Collision Center*, 310 S.W.3d at 196.  In the absence of an intentional act resulting in the taking of private property for public use, a claim for inverse condemnation under Article I, Section 17 is barred by governmental immunity.  *Id.*  A failure to act, including a failure to take corrective measures, is not enough to rise to the level of taking; it is merely an allegation of negligent conduct.  *Id.*  Appellees' takings claim, as

expressed in their third amended petition, is based on the City's construction, operation, and maintenance of the diversion dam and drainage system, not on the City's failure to act, e.g., its failure to obtain a full engineering study as recommended by Dr. Walton or its failure to alter the diversion and drainage system.  The City's third sub-issue is overruled.

*A Taking for Public Use*

In its fourth sub-issue, the City challenges the third element of a takings claim.  Article I, Section 17 provides for compensation only if property is damaged or appropriated for or applied to public use.  *Tarrant Regional Water District v. Gragg*, 151 S.W.3d 546, 554-55 (Tex. 2004); *City of El Paso v. Ramirez*, 349 S.W.3d 181, 186 (Tex.App.--El Paso 2011, no pet.).  Appellees alleged in their third amended petition that the City constructed a diversion dam and drainage system for the purpose of diverting floodwaters from affluent residential neighborhoods into a drainage system that inevitably caused flooding of downstream properties, including the commercial property of Appellees.  The City concedes that it constructed the diversion dam and drainage system for public use, but it vigorously denies that it constructed the system as part of a plan to protect only certain property owners at the expense of others.  The City contends that it negated this allegation of public use through the following portion of Alan Shubert's affidavit:

> Plaintiffs allege that, in regard to diversion of surface water by certain drainage structures (diversion dam, detention pond, and drainage system near the Coronado County Club), the City chose to protect certain property owners at the expense of others.  However, the City never decided to protect certain property owners at the expense of others.  Nor did the City accept the flooding of some properties as a necessary consequence of efforts to protect others.

Appellees, in turn, submitted the affidavit of Dr. Walton who offered his assessment of the purpose of the diversion dam and drainage system.  Dr. Walton stated that the City made choices that benefitted newer subdivisions and put the commercial buildings and older neighborhoods below at high risk of flooding.  We conclude that a fact issue exists with regard to this element.

The City's fourth sub-issue is overruled.

*No Recurrent Flooding*

In its fifth sub-issue, the City complains that Appellees' takings claim is not valid because they do not allege, and there is no evidence of, recurrent flooding. It cites *Gragg* in support of its argument that recurrence is a requirement of a valid takings claim based on floodwater impact. In *Gragg*, 151 S.W.3d at 555, the Supreme Court stated the following:

> In *City of Dallas v. Jennings*, 142 S.W.3d 310, 314 (Tex. 2004), which we also decide today, we hold that the requisite intent is present when a governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially certain to result. In the case of flood-water impacts, recurrence is a probative factor in determining the extent of the taking and whether it is necessarily incident to authorized government activity, and therefore substantially certain to occur. [citation omitted]. While nonrecurrent flooding may cause damage, a single flood event does not generally rise to the level of a taking. [citation omitted]. The recurrence requirement assures that the government is not held liable for taking property when a project's adverse impacts, and by implication its benefit to the public, are too temporal or speculative to warrant compensation. [citation omitted]. This is similar to the standard the federal courts have applied in determining whether the government's actions have taken property affected by flooding, [citations omitted] and it is the standard we apply in the present case.

While the Supreme Court observed that a single flood event does not *generally* rise to the level of a taking, it stopped short of holding that recurrence is an absolute requirement in these types of cases. In *Doss v. City of Victoria*, No. 13-07-306-CV, 2007 WL 4442616 (Tex.App.--Corpus Christi-Edinburg 2007, no pet.), the Thirteenth Court of Appeals addressed an argument that the plaintiff's allegation of a single incident of flooding was insufficient to confer subject matter jurisdiction. In that case, fifty-three homeowners sued the City of Victoria for damages to their homes resulting from high flood waters. *Id.* at *1. The City of Victoria installed storm and drainage sewers in the 1950's. *Id.* In 2004, it hired a contractor for a construction project that included improving the water lines, sanitary sewers, and storm sewers. *Id.* The contractor

warned the City of Victoria that the sewer pipes were so occluded they presented a substantial risk of high flood waters and if the City proceeded with the project as planned without clearing the pipes, a flood risk could not be eliminated. *Id.* The City of Victoria ordered the contractor to complete the project as originally specified. *Id.* In November 2004, an unusually heavy rain flooded the plaintiffs' neighborhood and damaged their homes. *Id.* The causes of action included a takings claim under Article I, Section 17. The trial court granted the City's plea to the jurisdiction. *Id.*

The court of appeals acknowledged the discussion in *Gragg* about the recurrence requirement, but noted that *Gragg* was not an appeal from a plea to the jurisdiction. *Doss*, 2007 WL 4442616 at *3-4. The court rejected the City's argument that a single flood event does not suffice to state a takings claim, finding that recurrence goes to the merits of the plaintiffs' claims and is not a pleading requirement to invoke the trial court's jurisdiction. *Id.* at 5. We agree with this analysis and will follow it here. The City's fifth sub-issue is overruled.

*Nuisance Claim under Article I, Section 17*

In its sixth sub-issue, the City argues that with regard to Appellees' claim for nuisance under Article I, Section 17, it is immune from liability for this claim unless it rises to the level of a constitutional taking. This issue is based on the other arguments already decided adverse to the City. Accordingly, we overrule sub-issue six.

*Takings Claim under the Fifth Amendment*

In its final sub-issue, the City contends that the takings claim based on the Fifth Amendment is invalid for the same reasons that the state takings claim is invalid. The City did not address Appellees' Fifth Amendment takings claim in its plea to the jurisdiction or in its supplement to the plea to the jurisdiction, but the Supreme Court has held that jurisdictional

issues can be raised for the first time on appeal. *See Waco Independent School District v. Gibson*, 22 S.W.3d 849, 849-51 (Tex. 2000)(holding that jurisdictional grounds not raised in plea to the jurisdiction can be raised for first time on interlocutory appeal). Consequently, we will address the City's arguments. We have already determined that the City's arguments raised in sub-issues one through four are without merit. The City argues that flood recurrence is a requirement in pleading a valid takings claim under the Fifth Amendment.

Federal courts have held that a plaintiff asserting a takings claim under the Fifth Amendment must prove that the land is subject to permanent or inevitably recurring floods. *See Turner v. U.S.*, 901 F.2d 1093, 1095 (Fed.Cir. 1990)(In order to show a servitude has been imposed through a taking by flooding, a plaintiff must prove that the land is subject to permanent or inevitably recurring floods.); *Hendricks v. United States*, 14 Cl.Ct. 143, 148 (Cl.Ct. 1987)( in an inverse condemnation through flooding case, the plaintiff must prove that flooding has been intermittent, frequent, and inevitably recurring because of authorized actions of the defendant); *Anchor Estates, Inc. v. United States*, 9 Cl.Ct. 618, 620-21 (Cl.Ct. 1986)(in a situation where works constructed by the Government on land owned or controlled by it cause the land of another to be subject to intermittent, frequent, and inevitably recurring flooding, it is held that the Government thereby takes a flowage easement over the affected land and must pay just compensation under the Constitution for the easement); *Singleton v. United States*, 6 Cl.Ct. 156, 162-63 (Cl.Ct. 1984)( "It is well established that the critical element of an inverse condemnation taking in a flooding case is that of inevitable recurring floods."). These cases establish that the requirement is one of proof but they do not state that it is a pleading requirement. We overrule sub-issue seven. Having overruled each sub-issue, we overrule Issue One and affirm the trial court's order denying the City's plea to the jurisdiction.

December 19, 2012

_____

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, J., and Medrano, Judge
Medrano, Judge, sitting by assignment